May it please the court, I'm Mohamed Hammoudi, I'm appearing on behalf of Mr. Harbans Singh. I respectfully ask to reserve three minutes for rebuttal. Please watch the clock. Mr. Harbans Singh's appeal involves a series of interconnected claims, and claims that seek to honor fundamental tenets of fairness and process, and processes that constitutionally set this country apart from many other countries. I want to briefly address our first claim, which is the statute of limitations claim. The government says that Congress enacted section 3292 for cases such as this one. We disagree. We ask that the court refer that claim to an embanked panel in light of Bishel and Jenkins, because our position is that those cases did not interpret the term suspend and running, applying this court's traditional statutory interpretation rules, the plain meaning rule. So should I take that to mean you agree that Bishel and Jenkins are controlling on this three-judge panel? On this panel, on the question that they're not clearly irreconcilable on the issue of suspend and running. Maybe I misunderstood the court's question. I'm sorry. In other words, unless an embanked panel overrules Bishel and Jenkins, we need to reject your statute of limitations argument. That's an option that I'm providing the court. And I want to focus my claims, I want to focus my arguments on two other issues. But I wanted to raise that issue. But in our briefs, we said that the court could ostensibly interpret Bishel and Jenkins, and factually distinguish them. But I'm just primarily asking the court to do that. I want to address the confrontation clause claim. The conduit exception procedures employed in Nazamian were not established at the time of founding of the Bill of Rights, or in American jurisprudence since that time. The federal rules of evidence do not recognize this exception. The confrontation clause requires the confrontation of testimonial witnesses, and requires that confrontation to occur face-to-face. And that did not happen here. Here, the statements that were at issue were, in fact, testimonial statements. They're statements that were relied on to convict Mr. Singh. The statements, just to be specific, are a statement by the asylum officer asking a question. The interpreter interprets that question. Mr. Singh ostensibly hears the question and responds to it. That response is then interpreted to the asylum officer. The asylum officer testifies in court about all of these statements. And four of those questions, that's the issue that was before the jury. Now, there is a federal rule of evidence, 604, that speaks to interpreters being qualified and given an oath or an affirmation to make a true translation. But that only applies to interpreters who translate testimony if witnesses understand. And so the critical question for this court is, if the declarant is the interpreter and the statement should be inadmissible hearsay. And the rules of evidence do not provide for this conduit exception. And the reason why we think that Nazimiyan is no longer good law is that when Judge Berzon is talking about that there's great tension between the rules of evidence and this language conduit exception is because Crawford was explicit. It said, we do not think that the framers meant to leave the six amendments protections to the vagaries of the rules of evidence. So we already held that Nazimiyan is consistent with the Supreme Court's decisions in Crawford and I fang yee. So aren't we bound by that case? We take the position, Your Honor, that because the standard of review in those cases were plain error, that the court did not truly reconcile the issues, the confrontation clause issue. And in this case, it is squarely before the court. One of the things that the court did not do is find whether or not this exception, this language conduit exception is, was established at the time of the founding of the Bill of Rights or in American jurisprudence since that time. And that's the Supreme Court's holding in Guyles v. California. And that's 554 U.S. 353. And there it is, California Supreme Court, they had a theory of forfeiture by wrongdoing. And the Supreme Court found that this was not an exception to the six amendments confrontation clause jurisprudence because it did not exist at that time. The language conduit exception is something, it's a creature that came out recently, like when I say recently, not 20 years ago, but in the 1950s. And even Wigmore on the rules of evidence says that this is hearsay, that this is a declarant that needs to be in court. And that's what the court means when it talks about the vagaries of the rules of evidence, that it's subject to change. We have the 11th Circuit that disagrees with the 9th Circuit. And so for that reason, we think that Nazarmenian is wrongly decided, and this is a case which is squarely before the court, which the court should reach that issue. In particular, because there's evidence before this court about what occurs during these asylum interviews is particularly sensitive. Could I ask you, counsel, what statement are we talking about? Is it the answer no when asked, have you ever been, and the translation is no? I think the questions that are posed to Mr. Singh are translated to him by the interpreter. So the interpreter would have to testify as to that interpretation. That's a declaration by the interpreter. And the answer is also an interpretation that's coming back and going back to the asylum officer. There is a back and forth. And to place things into perspective, Your Honor, you're talking about these questions are being asked after there is a long discussion about an asylum claim  and then at the end of this interview, then they're asked these questions, and they're leading questions. Well, as I understand it, under Crawford, we're talking about matters that are offered for the truth of the matter asserted. Crawford doesn't apply to non-hearsay. So the question wouldn't be hearsay. It's not making an assertion. It's asking a question. Wouldn't that be true? That depends who the declarant is, Your Honor. The declarant is the interpreter because the asylum officer does not speak Punjabi. So the asylum officer is listening to the interpreter, and then the interpreter's statements is then being conveyed back to the jury. Now, what Crawford is concerned with, Your Honor, just to sort of touch on that point, it doesn't provide you with a substantive protection. It provides you with a procedural protection. It's where confrontation occurs, how it occurs. The interpreters need to come to court. These Nazamian factors, to the extent the court wants to abide by them, those findings need to be made by a jury, or those credibility findings should be made by a jury. It's that procedure itself that violates Crawford. In fact, Crawford, the reason Crawford came down was the state of Washington had a nine-factor test that applied to the reliability of hearsay statements, and the court said, you can't do that. That's not consistent with the country's founding. And the procedural mechanism is that the witness comes into court, and they sit in front of the jury. They're asked questions, and they answer by way of example. At the 104 hearing, which was conducted virtually with one of these alleged interpreters, the government begins their questioning and is asking questions in a leading manner of this interpreter. And as the leading questions go, the interpreter is just saying, yes, yes, yes. Trial counsel interjected an objection, leading. And once that objection was sustained and the leading stopped, what you learned was that the witness just started to give answers that were at odds with the earlier testimonies. My brain did not work, and things of that nature. Those are the things that are supposed to procedurally and formally happen in front of a jury. And so I want to address one other issue briefly, which is the materiality defense. We are not saying that the law should be – that the instruction was not appropriate on materiality. The instruction is fine. We didn't challenge the law. What we're saying is that we're entitled to put on evidence and counter the government's evidence and say, don't believe their story. Don't credit their story. These are the exact facts as occurred in this case. The government does not dispute our proffer. They did not dispute our proffer. Their concerns were that it was legally irrelevant and that the jury might – that this would amount to nullification. I think that's a little presumptuous, respectfully, about the jury being nullified. If the court had concerns about nullification, the court could have issued limiting instructions or instructed them accordingly as to how to interpret the evidence. But denying wholesale evidence for Mr. Singh to put on on that issue, we believe, violated his constitutional rights. We do not waive any of the arguments or claims that we made in our opening brief, unless the court has any questions. But if the test for materiality is an objective one that looks at the capacity of the statement to influence, then why does it matter whether or not the particular person to whom the statement is made already knows that it's a lie? It still could be a really big, important lie and that has a capacity to influence, even though the hearer knows that it happens to be a lie. The capacity to influence, and then if you have evidence before the jury that it did not influence, it tends to speak to the capacity to influence. I mean, it's not that the judge instructs on the law and say, hey, you cannot say that subjective capacity is the law. But you can still say that it wasn't objectively material, given the record before the evidence that defense ostensibly would have wanted to put on. But separately, it would call into question the credibility of the government's evidence as a whole about how the case transpired and whether or not they have applied the standards that are relevant in determining asylum applications. I mean, one of the things we could have argued is that this wasn't an asylum interview, which was argued. That this was, in essence, an interrogation in the colloquial sense, not in the legal sense, and that these individuals should have been brought on to testify to explain as to what happened. Why wasn't it material to you what happened? And under the crucible of cross-examination, certain truths might be revealed that were not contained in the proffer because the witness is sitting in front of the jury. And the judge is situated to make rulings on the stand. If he feels that the questioning is sort of going far afield into irrelevant matters, objections can be lodged, and we can deal with matters on the side bench. But wholesale exclusion of evidence and witnesses, Your Honor, violated his rights. I would like to reserve my last two and a half minutes on this. All right.  We'll hear from the government. Good morning, and may it please the court. William Dreher for the United States. Of the defendant's five arguments on appeal, three of them he conceded below, and as we indicated in our briefing, are obviously foreclosed by squarely on-point precedent of this court. A fourth, his Speedy Trial Act claim was plainly waived under this court's precedence when he failed to move to dismiss at any point prior to trial. A question about the Speedy Trial, not the Speedy Trial, the statute of limitations issue. I was able to find in the record the closing report that sent by the Brits back in response in May of 2020 to the MLAT. But I wasn't able to find, and maybe you can point me to where it is in the record, where the response is from the Brits in 2019. All I see is an internal communication from the OIA back to within the department. I didn't actually see the response from the British in 2019. Is it in the record? So I confess I would have to see if we included it in our supplemental excerpts of record, the Brits, the United Kingdom's response, rather than the letter, which was included in the record by the defendant below, the letter from the DOJ attache, which is just an internal, as you know, internal communication within DOJ. Because what's interesting is this one is styled as a closing report, and I'd be very curious to know whether the response sent in 2019 was also styled as a closing report, because reading the OIA communication, it looks like it may have been, because it's like, well, here's what we're going to give you, and we object to the rest. Closing report, which might impact how the statute applies, because arguably that ends the first request, and then you make a second request because we really want the rest, you re-engage. And how that fits in the statute is not clear, because we don't really have the response from the British in the record. So let me just, I will clarify the timeline of this, because it's actually quite clear the way that this played out, and that's why the district court made the factual finding below that the May 2019 response from the United Kingdom was not final action under 3292, and that final action didn't occur until June of 2020. There was a, the original MLAT request was submitted in April of 2018. In early 2019, there was a supplemental request made for a different kind of records, the defendant's immigration records. Four months later, in May of 2019, we received a response only to that supplemental request. So we received immigration records only. And as the internal emails at ER 198 to 199 show, and as we represented below, and as the district court found, we then said, what about all the materials that we requested in April of 2018 with respect to his underlying arrest? The fingerprint cards, certified copies of all of these documents that we had obtained on a law enforcement to law enforcement basis. So the May 2019 is only to the supplemental and not at all to the original one. Was there any response in May 2019? Was it objections to the original one? Did they say anything about it? No. So the only evidence in the record that I'm aware of with respect to the U.K.'s view on the original request, and as of May of 2019, is the email from the DOJ attache that says, here's the status of that original request. It's still pending. The U.K. has indicated that they thought our original request was overbroad. They're not going to produce some things that we requested. They are working on producing the remaining records. And then there are further emails in the excerpts of record at, I believe, 203 to 205, in which in further follow-up in March of 2020, the DOJ attache again confirms the United Kingdom is still working on fulfilling that request. So that's why the record presented to the district court was very clear on this point. There is no evidence that final action was taken. And, in fact, in June of 2020, the United Kingdom produced certified copies of all these records we had requested, along with a certification attesting to their authenticity. And we obviously indicted Mr. Singh within a matter of weeks after receiving those records. And let me just – I will grab the record and just make sure that that 203 to 205 is correct. Citation. Citation. Yes, so 203 to 204. And that is the email from myself in March of 2020 and the response from the Department of Justice legal advisor with respect to what the United Kingdom was still doing in March of 2020 to respond to that original MLAT request. There's certainly been no showing that the findings, the very fact-intensive findings by the district court as to how that played out were clearly erroneous. The defendant just asserts that the May 2019 letter was a final response by the United Kingdom, and the district court found that there was no merit to that assertion. I would like to just address briefly the two claims raised or most focused on by the defense during their argument. First, with respect to the confrontation clause, I would note that, yes, it is the government's view, and we think it's correct, that a question is not subject to confrontation because it is not – unless there's an implied assertion, which we don't think was true in this case. It's not being offered for the truth. It's non-hearsay, and therefore it's not subject to confrontation. So what happened in this case is the asylum officer testified. Mr. Singh was asked a question. Perhaps an objection could have been lodged at that point as to foundation, as to how that witness knew exactly what question the interpreter asked Mr. Singh. There was no objection raised to that testimony coming in. There's been no claim on appeal that that was somehow improper. So the only confrontation issue that was raised is with respect to these four one-word answers, no, no, no, no, in answer to the questions that were asked. Now, on the question of whether Nazemian's rule or the Eleventh Circus rule makes the most sense, obviously we did not address that in our briefing. It's appropriate – it would be appropriate only for an en banc court, given the binding precedent of this court. But it's not – Nazemian's rule is not a strange rule. It's all about trying to determine when you attribute a statement to a defendant, and a defendant's statements are not subject to confrontation and they are non-hearsay. And there are other circumstances, like public records, business records, in which there are separate declarants, like a declarant who produces a certificate of authenticity, who is not required to be subject to confrontation because of long historical practice or the inherent reliability of those records. And so there are other cases of this court stating, for example, that business records and public records may be admitted, notwithstanding that the certificate of authenticity is technically, you know, under the Eleventh Circuit's reasoning would be written by a separate declarant. The last thing I would just note is the Eleventh Circuit's rule does lead to some strange results. So, for example, in a case where – in an actual trial, in this trial, the defendant had interpreters present. If he had testified in a different language, those interpreters would have had to translate his statements for the record. And that means that in the Eleventh Circuit, I suppose in any future criminal proceeding in which he admitted something that's an element of a future offense, for example, the government would have to go find those interpreters to bring them back and would not be able to rely on the court-produced transcript of the proceedings because technically it would be the interpreters in that context that are deemed the declarant who need to be confronted. And in most cases, I think as the record in this case indicates, interpreters are not going to – especially professional certified interpreters who interpret frequently – are not going to remember years later what happened or how they interpreted an interview. And so most often the confrontation is going to be, do you recall doing this specific interpretation? Likely no. Do you recall what was said? No. And then the witness – the statements, even in the Eleventh Circuit, by the agent, for example, or the asylum officer in this case, would still be admissible under the rules of evidence. The Eleventh Circuit made clear that it still thought these kinds of statements by an interpreter are admissible as party opponent – or could be admissible as party opponent admissions. It only stated that there was this confrontation concern. And then lastly, this case would be not a good vehicle for reconsidering this question because it's so, in the government's view, so obvious under Nazemian and this Court's precedent. It involves a case where the defendant actually brought his own interpreter to the interview. There was a second interpreter present to double-check the translations. The defendant's answers were consistent with the answers that he had given on prior documents. His other answers were apparently correctly translated insofar as they matched the biographical details on documents that he had submitted. So again, applying all of the factors in Nazemian, this case would just be one that is really at the core of attributing a statement by a defendant's agent or representative to the defendant. And then lastly, with respect to materiality, I think that it is clear that the defendant below was dissatisfied with this Court's precedent, but that precedent is clear that even if an agent knows that an answer is false prior to an interview, that can still be material as long as there is testimony establishing that, in general, that type of statement would be material to the agency in question. Perhaps the best case or an illustrative case on this is one cited by the defense. That's the Lindsay case, which recently precluded a defendant who was trying to introduce evidence that lenders in his case had not relied on his specific misrepresentations. And this Court said, no, you can't introduce evidence that the specific lenders hadn't relied. You can introduce evidence that, in general, lenders would not rely on those kinds of representations, but not case-specific evidence of the lenders in your case. And that's exactly what he was attempting to do here, is introduce evidence with respect to the specific agents or agencies that had not relied on his representations. If there are no further questions. I do have a question about the Speedy Trial Act. How long were criminal trials suspended in the district? So my recollection, and from the record, is that between March of 2020 is when the courthouses were first closed for criminal trials, and that they reopened in mid-May of 2021 on a limited basis. So for 16 months, not a single criminal jury trial was conducted in the entire district? I think that's correct. Fourteen months is my understanding that, yes, no jury trials were conducted. No criminal in-person jury trials were conducted. Okay. Do you know if grand jury proceedings were conducted in the building during that time? Grand jury proceedings were conducted for a portion of that period, not initially, but after a period of time, they resumed in a larger facility, in actually one of the courthouses. Okay. If we were to reach the merits, as I understand you're saying it's waived because they didn't move to dismiss, but if we were to reach this issue, do you need to rely on the COVID portions or are the motion exclusion portions of time sufficient? So that's one of the difficulties with the failure to bring a motion to dismiss in this case, is we don't have the district court's assessment of how much time as of September of 2021 would have been. Well, but the exclusions are supposed to be papered by orders, you know, in advance, whether or not there's a motion to dismiss. So when we have the orders and they do have certain numbers of days on motions and then other numbers of days on general orders, you know, prevented us, we prevented ourselves from conducting jury trials and it's therefore impossible. Right. So I suppose what I would say is there is some record. If the court were to rely solely on, or I should say first that the latest court determination with respect to the number of days So during that six month period, we don't have a calculation from the district court of what periods of time would have been excludable. But as of March 2021, when the last continuance was granted, the excludable time that's automatic under the statute calculated by the district court at that point would not have been sufficient to extend the trial date beyond April 12th of 2021. But this is a case where the district court in its various orders cited things other than COVID. So, for example, it's cited in January or it may have been December that the district court cited the fact that defense counsel and counsel for the government had other trials at that point scheduled and that therefore counsel for either party would have been unavailable. So it specifically found that which is another basis for making an ends of justice determination. And of course, the fact that we had this United Kingdom witness who for much of that time was prohibited as a non-citizen from coming to the United States unless we received a discretionary exception to that rule, which is a national security exception that we would have had to apply for and sought just prior to trial. Thank you. I do want to address, Judge Collins, your questions about the internal documentation and the excerpts record 198 to 205. Those are internal Department of Justice correspondences. The court is correct. In 2019, there was no document that was sent, nor was there one disclosed to the defense from the United Kingdom, like the one that you identified. It's not in the record at all because I couldn't find it in the excerpts or in the district court documents. No. If we had it, we would have certainly made it part of the record. On the question of confrontation clause, there was a suggestion that we waive. I direct the court's attention to the supplement excerpts record 292. The government was very explicit when we asked them, do you want us to lodge due process and confrontation clause objections while these witnesses testify? They said, no, it's fine, that your objections are preserved. It's a little unfair to come now and say that he had waived those objections when, in fact, they acknowledged that there was no need to interrupt trial proceedings to lodge those objections. On the issue of court-produced transcripts, I would just add that there was no court-produced transcripts. The interpretation was not transcribed, nor was there a signature taken from Mr. Singh to adopt the statements, which was, in fact, suggested to the asylum officer to do for the particular reason of in the event we have to go to court years later and we have to deal with a situation like this. Now, if the court looks at the 104 hearing, the virtual 104 hearing with these interpreters, it was never even established that those two interpreters were in a room with Mr. Singh. So we don't even know if it was those two interpreters. This idea that Mr. Singh brought his own interpreter, it must also be established that it was which interpreter. The asylum officer didn't testify at trial regarding the qualifications of these interpreters. The asylum officer, none of those discussions were had. That was the problem with this case. Confrontation problem in this case was created by the government. They're the ones that decide when to charge cases. They're the ones who decide when to bring evidence. They're in control when they invoke the court's power to convict and punish people. And so it's a significant problem in this case, Your Honor. And for the reasons we asked in our opening brief, we respectfully ask that the court reverse. Thank you so much. Thank both sides for their argument. The case of United States v. Harp and Singh is submitted. We'll take a five minute recess.
judges: IKUTA, COLLINS, Fitzwater